IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No. 12-cv-01699-RBJ-CBS

A PDX PRO COMPANY, INC., an Oregon Corporation,

    Plaintiff,

v.

DISH NETWORK SERVICE, LLC,

    Defendant.

## ORDER

Defendant moves for summary judgment. For the reasons discussed below, the motion is granted in part and denied in part.

**FACTUAL BACKGROUND**

Dish Network Services, LLC (Dish Network) sells and leases satellite systems, stand-alone satellite receivers and related accessories. A PDX Pro Company, Inc. (PDX) provides installation services. On December 31, 2004 Dish Network and PDX entered into an "Installation Services Agreement" or "ISA" for the non-exclusive provision of installation and after-sale services to Dish Network customers through December 31, 2006. [ECF No. 128-1]. The initial ISA was succeeded by second and third ISA's effective December 2, 2006 and December 15, 2009. [ECF Nos. 128-9 and 128-10]. Dish Network terminated the third and final ISA on July 11, 2011.

The 2004 ISA required that PDX comply with certain "Business Rules" in addition to the terms of the ISA itself. In its Third Amended Complaint [ECF No. 56] PDX alleges that the

Business Rules were provided long after it signed the ISA; that PDX was provided only an incomplete copy of them at that; and that they were "coercively forced on PDX." *Id.* at ¶8. But Dish Network has produced evidence that PDX did know what the Business Rules were, and that it was required to comply with them. Motion for Summary Judgment [ECF No. 124] at 5-6, ¶¶5, 7. The fact is that PDX entered into the 2004 ISA knowing that compliance with Business Rules was mandatory, even if it did not yet know precisely what the Rules would be, and that it continued to work under the terms of the ISA for two years, presumably after it knew or should have known what the Rules were.

On the other hand, so far as I can determine, the 2006 and 2009 ISA's did not expressly refer to or incorporate the Business Rules. Dish Network notes that the 2006 ISA provided that it "is the full and complete understanding between [DNS and PDX] and supersedes any and all prior or contemporaneous oral or written understandings or agreements." Motion for Summary Judgment at 7, ¶15. The 2009 ISA contains a similar provision. [ECF No. 128-10, ¶ 20]. All of that notwithstanding, the parties seem to assume in their summary judgment papers discussed below that the Business Rules applied to the 2006 and 2009 ISA's as well.

Regardless of the Business Rules, however, PDX alleges that Dish Network imposed numerous demands, conditions and requirements that were unreasonable and, for the most part, were neither provided for in the 2004 ISA nor known to PDX before it entered into the 2004 IRA. *Id.* at 12-30. But again, notwithstanding this alleged mistreatment, PDX continued to provide services to Dish Network customers for approximately seven years.

The primary focus of the present case is that Dish Network has not paid PDX for all the services and equipment that PDX did provide during those years. PDX alleges that Dish Network exercised the "unfettered discretion" that it enjoyed under both the ISA's and the

2

Business Rules, most notably its documentation and reimbursement procedures, to deny payment owed. *Id.* at ¶¶40-41. The problem arises from the admitted fact that, over the years, PDX often failed to comply strictly with Dish Network's complicated set of procedures for the documentation and submission of payment requests. During the course of this case it has become apparent that PDX's bookkeeping and compliance procedures were in disarray. PDX's President Michael Paxton admitted in a deposition that, at times, PDX's accounting system was something of a "black hole." [ECF 130-9 at 3].

Nevertheless, Dish Network apparently recognized that even though PDX was not always complying with its rules for seeking payment (and perhaps because Dish Network's own mistakes might have contributed as well), it was unfair for Dish Network to be receiving substantial benefit from PDX's work without paying for it. So, PDX alleges, Dish Network agreed to modify its procedures and to receive late claims under what has been described as an "Exception" process. Third Amended Complaint [ECF No. 56] ¶¶ 44, 50. According to PDX, "[u]nder the Exception process, a contractor can go back and review past payment data that falls outside the normal timeline and procedures for payment for work completed. In other words, it is a process where Dish promises to make an "Exception" for a contractor to receive payments for work completed that was not paid during the normal process due to mistakes made by either the contractor or Dish." *Id.* at ¶45.

PDX alleges that it first requested a "payment Exception" and submitted reconciliation or "recon" information in early 2006. However, Dish Network did not act on that request until 2007, and even then, despite assurances from various Dish Network employees, the payments were not made. PDX refers to this as the "First Exception" (sometimes also as the "2007 Exception"). *Id.* at 48-52.

PDX alleges that, notwithstanding the unsuccessful implementation of the First Exception, Dish Network representatives indicated in 2009 (confirmed by upper management in 2010), that PDX could begin a "Second Exception" process which would reach back and correct mutual mistakes made for 2006 through 2009. *Id.* at ¶53-57. This process broke down for various reasons, attributed by PDX at least in part to Dish Network's failure to provide reconciliation information that it needed and that it allegedly paid for via a "data mining" payment. *Id.* at 59-66. The process ended with a thud. According to PDX, Dish Network reneged on previous representations and returned to its insistence on strict compliance with its Business Rules. *Id.* at 68-72.

Dish Network now contends that it implemented the Exception process without consideration or obligation. *See* Motion for Summary Judgment [ECF No. 124] at 12-15. I will return to that subject later. Regardless, it is undisputed that Dish Network made some payments to PDX as a result of the Exception process. But PDX denies that Dish Network fully honored its promises that were made as part of the process. It claims that substantial additional compensation is owed.

PDX asserted seven claims for relief in its Third Amended Complaint: (1) breach of the ISA(s) and their implied covenant of good faith and fair dealing; (2) promissory estoppel; (3) quantum meruit; (4) unjust enrichment; (5) civil conspiracy; (6) declaratory judgment; and (7) negligent misrepresentation. In an order issued on July 1, 2013 the Court dismissed the civil conspiracy and declaratory judgment claims. [ECF No. 77]. On December 16, 2013 Dish Network filed the pending motion for summary judgment, seeking dismissal of the remaining claims. [ECF No. 124]. Plaintiff responded [ECF No. 164], and the motion became ripe for this Court's review upon the filing of Dish Network's reply on January 27, 2014. [ECF No. 166].

Before turning to that motion, however, I note that this case has been plagued by discovery disputes, largely caused by PDX's inability or unwillingness to comply with Dish Network's discovery requests. Although I addressed some of these issues, the bulk of the work has been done by Magistrate Judge Craig B. Shaffer who has conducted numerous hearings and issued numerous orders. Most recently, Judge Shaffer issued an order on February 26, 2014 imposing monetary sanctions and also recommending that this Court impose evidentiary sanctions. Regarding the latter, he recommends that the Court preclude PDX from asserting entitlement to compensation at trial for any transaction other than 3,541 transactions identified in spreadsheets filed on February 25, 2014; that it be barred from presenting documentation other than that to which PDX referred in the spreadsheet; and that it be precluded from arguing or insinuating to the jury that its inability to produce additional evidence is attributable to any fault by Dish Network. [ECF Nos. 181, 182]. Objections, if any, to the recommendation are not yet due.

Trial of this case is scheduled to begin on March 31, 2014. I held a trial preparation conference on February 26, 2014, the same day that Magistrate Judge Shaffer was holding his sanctions hearing. During that conference it became apparent that PDX could not continue to pursue some of its claims, and that the parties did not even agree on what PDX's contract claims were. More on that below.

## ANALYSIS

### I. CLAIMS OTHER THAN BREACH OF CONTRACT.

To begin, PDX's counsel acknowledged at the trial preparation conference that PDX's Seventh Claim (negligent misrepresentation) should be dismissed. PDX also acknowledged that its Third and Fourth Claims (quantum meruit and unjust enrichment) are duplicative of each other.

Unjust enrichment and promissory estoppel apply to situations where there is no governing contract. PDX contends that the parties' relationship was at all times governed by the terms of contracts, i.e., the ISA's, the Business Rules and what it considers to be modifications of those agreements in the Exception process. As discussed further below, Dish Network denies that the Exception process created additional contractual obligations. Suffice it to say that because Dish Network does not concede that promises and representations made by its personnel during the Exception process are contractually binding, I must allow for the possibility that the doctrines of unjust enrichment or conceivably promissory estoppel might come into play.[1]

### II. THE CONTRACT CLAIM.

PDX alleges that its contracts with Dish Network contain an implied covenant of good faith and fair dealing. I agree. Under Colorado law, which applies in this diversity case, every contract is deemed to contain such a covenant. *See, e.g., Amoco Oil Co. v. Ervin,* 908 P.2d 493, 498 (Colo. 1995). This covenant arises when the contract grants a party discretionary authority to set or control certain aspects of performance, such as determining quantity, price or time.

---

[1] In its summary judgment reply, Dish Network suggests that PDX has abandoned its unjust enrichment and promissory estoppel claims. [ECF No. 164 at 2]. I do not agree.

That party may not exercise its discretion in a manner that defeats the reasonable expectations of the other party. The implied covenant cannot, however, contradict express terms for which a party has bargained. *Id.*

The problem is that PDX has made it difficult to get a grip on precisely what breaches, whether of express terms or implied terms, it is relying upon. In an effort to figure this out, I have looked at the Third Amended Complaint; the spreadsheet that is the subject of Magistrate Judge Shaffer's sanctions recommendation; and, of course, the briefing on the motion for summary judgment.

### A. The Third Amended Complaint.

In its Third Amended Complaint, First Claim, PDX broadly alleges that Dish Network has "extraordinary discretionary authority under the Installation Agreement to interpret and apply 'in its sole discretion' the material terms and manner of performance of both parties, including the discretionary right to determine the unspecified amount of payments to be made to PDX for its services; change the unspecified rates to be paid PDX; add more unspecified terms; unilaterally decide what PDX owed Dish for failure to perform; etc." [ECF No. 56, First Claim ¶ 3].

PDX then set forth a list of 17 "examples" of grants of discretion:

a) "DISH Network from time to time **may offer Contractor the opportunity to perform** the Services for Customers provided that Contractor agrees to all of the terms and conditions set forth in this Agreement" (Section A);

b) "DISH Network will provide Contractor with a written request for Services (the "Referral"), which will include… (iii) the **compensation, if any**, to be paid by DISH Network to Contractor for performing the Services; and (iv) **any additional terms and conditions** applicable to the Services to be performed; (C.1);

c) "Contractor will be obligated to perform the Services in accordance with the terms and conditions of this Agreement, the applicable Referral and **the Rate Sheet in effect** as of the time of the Referral Acceptance"(C.1);

d) PDX "agrees to accept DISH Network's standard mileage compensation for miles in excess of that distance, as such standard mileage compensation **may change** from time to time in **DISH Network's sole discretion"**(C.2(a));

e) "DISH Network shall have the right to determine, **in its sole judgment**. [sic] whether a location constitutes a "residential location" or is more appropriately considered a commercial or other non- residential location" (C.2(b)(2));

f) **"**DISH Netwotk's [sic] **calculation of amounts owing** to DISH Network from Contractor under this Section 2(b) **shall be binding** absent manifest error (C.2(b)(2))";

g) DX will "promptly return lo DISH Network any and all forms or other documents required by DISH Network with respect to the Service as such forms and documents **may change** from time to time **in DISH Network's sole discretion"** (C.2.(b)(3));

h) "DISH Network shall pay Contractor in accordance with the rates (the "Rates"} set forth in the Rate Sheet in effect at the time of the Referral Acceptance, as such **Rates** and Rate Sheet **may change** from time to time **in DISH Network's sole discretion"**(C.2 (b)(4)(a));

i) "Contractor acknowledges and agrees that DISH Network **may assess**, and Contractor agrees to pay, **such fees as DISH Network may determine** from time to time **in its sole discretion** for documentation errors (including, but not limited to, accuracy and legibility) or **failure to perform the Services in accordance with the specifications set forth in the applicable Referral or the Rate Sheet in effect** at the time of the Referral Acceptance" (C.2 (b)(4)(a));

j) "Except when the de-installation is due to Contractor's defective installation, DISH Network **will pay Contractor a de-installation rate** (the "De-Installation Rate") to be determined in DISH Network's **sole discretion**, as such De-Installation Rate may change from time to time in DISH Network's **sole discretion"**(C.6);

k) "Contractor shall not engage in any activity or business transaction which could be considered unethical, **as determined** by **DISH** Network in accordance with prevailing business standards, or damaging to DISH Network's image or goodwill in any way"(8(b));

l) PDX "will, at all times, present a professional business appearance and attitude, as determined by DISH Network in its **sole discretion**" (C.12(f));

m) PDX "will maintain, at Contractor's sole expense, adequate professional, general liability and motor vehicle liability insurance policies, with coverage levels and through companies., satisfactory to DISH Network in its **sole discretion"** (C.12 (g));

n) PDX "will obtain, upon DISH Network's request as required under a Referral and at Contractor's sole expense, a subcontract bond a ("Bond") in an amount no less than $5,000.00 (or a greater amount if required by DISH Network from time to time in its sole discretion), in such form as DISH Network may require" (C.12 (i));

o) "In the event that Contractor fails to adequately perform its warranty obligations or to adequately perform the Services after a Referral Acceptance (ln [sic] each case, as determined in DISH Network's **sole judgment**),then DISH Network shall have the right without further notice to Contractor, to correct such defects or to perform such Services. in which event Contractor shall upon demand reimburse DISH Network for

8

> the costs and expenses incurred by DlSH [sic] Network in connection therewith, plus an additional twenty percent (20%) of such costs and expenses as a fee for supervision and reimbursement for DISH Network's overhead in connection with such work" (C.14);
>
> p) "Contractor acknowledges and agrees that DISH Network and its Affiliates shall have the right (but not the obligation), and are hereby **authorized, to offset** any **monies due to DISH Network** and/or any of its Affiliates from Contractor **for any reason against any monies due to Contractor** from DISH Network and/or any of its Affiliates" (C.17); and
>
> q) "Further, DISH Network **may**, but shall have no obligation to, **withhold such sums** from any monies due or to become due to Contractor hereunder as DISH Network **in its sole discretion. [sic] deems necessary** to protect DISH Network (from any loss, damage, or expense relating to or arising out of Contractor's performance of Contractor's duties hereunder." (C.17).

*Id.,* First Claim ¶4 (emphasis in original).

These "examples" appear to be taken from the 2006 and 2009 versions of the ISA, although they do not trace perfectly to the paragraphs cited. There are similar provisions in the 2004 ISA as well.

PDX did not, however, indicate which of these grants of discretion it contends Dish Network has exercised unfairly or in bad faith. Instead, PDX alleges, generally, that Dish Network acted in bad faith by failing to pay for work performed, failing to pay for equipment purchased by PDX that was installed on Dish Network jobs, denying payment for arbitrary reasons, imposing and threatening incorrect offsets, enforcing post-agreement Business Rules which provided a pretext for non-payment, and making false promises about payment and deadlines for making claims. *Id.,* First Claim ¶7. The Third Amended Complaint then lists 19 types of bad faith conduct, still not linking any of them to specific grants of discretion in the ISA's or Business Rules. Again I simply quote the First Claim, this time ¶7:

> a) DNS misrepresented and made contradictory statements about what supporting data it could access, provide or needed;

9

b) DNS misrepresented and made contradictory statements about the status of the Exception process;

c) DNS misrepresented and made contradictory statements about whether Dish would pay for Exceptions;

d) DNS misrepresented and made contradictory statements about whether the Exceptions included both Dish mistakes and PDX mistakes;

e) DNS used threats to charge PDX for overpayments to deter PDX from pursuing an Exceptions [sic];

f) DNS ceased giving PDX work until PDX stopped pressing for payments due PDX;

g) DNS prohibited PDX from declining to do work;

h) DNS prohibited PDX from doing work for DirecTV;

i) DNS prohibited PDX from using competitor's products;

j) DNS prohibited PDX from having agreements with customers;

k) DNS required PDX to remove competitor's product;

l) DNS required PDX to perform unsafe installations in apartments;

m) DNS allowed a Dish manager to impose his own personal rules on PDX, and take away work from PDX when PDX did not comply;

n) DNS allowed a Dish manager to seek money from PDX, and take away work from PDX when PDX did not comply;

o) DNS refused to provide requested training on its payment systems, in spite of promises that it would provide training;

p) The accounting and payment departments of Dish were intentionally understaffed to create chaos and make it extremely difficult for contractors to have their claims processed fairly or correctly;

q) There was a corporate policy to make it very difficult for contractors to be paid for their services; and if a contractor's claim for payment was denied it would be assessed a fine for just making the attempt;

r) During a phone conversation with Mr. Paxton, a Dish attorney threatened to have PDX terminated if Mr. Paxton made public his views about how Dish exercised such complete control over PDX that PDX and its staff were employees of Dish for tax puposes [sic];

s) DNS terminated PDX as a Dish contractor because of PDX's communications about (a) through (r).

It is undeniable that Dish reserved to itself a great deal of discretion, and it is equally undeniable that Dish Network had a duty to exercise that discretion in good faith.

But if PDX is going to rely on breaches of the implied duty of good faith and fair dealing,

it must be able to identify the specific grant of discretion; the specific conduct that constitutes a bad faith exercise of the discretion; and the harm (here the underpayment) that was caused by the exercise of bad faith. Put another way, it might be good enough for pleading purposes to throw out long lists of grants of discretion and alleged acts of bad faith, but that style is not good enough for trial.

### B. The Spreadsheets.

By means of a pleading filed on February 25, 2014, PDX indicated that it is seeking damages arising from 3,541 separate transactions. [ECF No. 174]. These are divided into four categories: uncompensated labor (1998 transactions); equipment that PDX installed but for which it was not reimbursed (389 transactions); equipment that it returned but for which it was not compensated (1079 transactions); and equipment that it contends should have been repurchased (75 transactions). *Id.* The transactions and supporting documentation are identified in attached spreadsheets. PDX states that this listing of transactions "represents the broadest interpretation of what PDX believes the court may rule in light of the arguments presented in connection with Dish's motion for summary judgment." *Id.* at 1.

The transactions listed in the spreadsheets are quite specific in one sense. For example, the spreadsheet for "equipment" [ECF No. 174-1] begins with a line item claim of $149 for a 322 receiver. This was Work Order No. 970539516050322001 and had a work order "close date" of January 6, 2006. I cannot determine from the spreadsheet whether PDX submitted a timely initial request for payment on this transaction. The spreadsheet indicates that PDX requested payment under the "2007 Exception" on October 5, 2005 (this must be a typo). This apparently was denied, but PDX does not

11

know the date of denial. PDX submitted a "rebuttal" to the denial of the exception on December 21, 2007 but received no response. The spreadsheet indicates that PDX was unable to resubmit this claim under the "2010 Exception," because it was given less than one month's notice and couldn't get it done (this seems to be true of many entries on the spreadsheet). This work order claim is assigned to the category "Business Rule."

The equipment spreadsheet contains 31 pages full of similar entries. PDX prepared additional spreadsheets for labor, return authorizations and buybacks. [ECF Nos. 174-2, -3 and -4]. Altogether there are 275 pages of spreadsheet representing the 3,541 transactions PDX was relying on as of February 25, 2014.

Magistrate Judge Shaffer's recommendation would limit PDX to these 3,541 transactions and the documents referenced in the spreadsheets. There would have to be testimony explaining the spreadsheets, and I do not read his recommendation as excluding such testimony. In that sense, the recommendation is not all that limiting. Indeed, it is difficult for me to envision as a practical matter how PDX plans to present and defend damages claims arising from that number of transactions at trial.

Regardless, the spreadsheets do not address the basic liability issues. To establish its case, PDX must first be able to show as to any claim of breach of contract that there was a breach of a specific contractual obligation. Again, this could be an express term of one of the ISA's; or the breach of a specific Business Rule; or, potentially, a breach of an oral modification of the written instruments in the Exception process; or the bad faith exercise of a specific grant of discretion. If a breach is established, then it must be shown that the breach resulted in the failure of Dish Network to pay for the particular labor or equipment provided (causation). The amount of the allegedly unpaid claim is important,

but PDX only gets there if it establishes a breach and causation relevant to the particular claimed amount.

### C. The Summary Judgment Briefs.

Dish Network begins its 55-page motion for summary judgment with a list of 72 undisputed facts [ECF No. 128 at 4-12]. This list of facts is supported by 48 attached exhibits. [ECF Nos. 129-34]. PDX responds separately to each paragraph and, by my count, admits 39 of these "undisputed facts," denies 16 others, and neither completely admits nor denies the remaining 17 (frequently admitting the statement but then asserting additional explanatory or corrective facts). [ECF No. 150 at 1-8]. Having thus entered is admissions and denials, PDX then sets forth 26 numbered paragraphs of its own "additional undisputed facts." *Id* at 8-15. The Court rejected Dish Network's initially tendered Reply as excessively long. Undaunted, Dish Network filed a shorter Reply but noted its disputes concerning PDX's denials of, and additions to, Dish Network's "undisputed facts" as exhibits C and D to its reply. [ECF Nos. 164-C and –D].

The Local Rules of this Court require that a motion for summary judgment include a "statement of undisputed facts," supported by argument and a recitation of legal authority. D.C.COLO.LCiv.R 56.1. However, the problem with the parties' approach to that task here is that it lacks focus. The question is whether there are genuine disputes of <u>material</u> fact that require a trial. Nevertheless, after slogging through the "undisputed" (but often disputed) facts, I turn to the parties' argument to see whether they might provide the focus previously lacking.

13

**1.** <u>Statute of Limitations</u>**.**

Dish Network first argues that PDX's claims are barred by Colorado's three-year statute of limitations applicable to contract actions. The statute of limitations is an affirmative defense as to which the party asserting it has burden of proof.

I agree with certain parts of this argument. Claims for breach of contract generally are barred if they are not filed within three years after the cause of action accrued. C.R.S. 13-80-101(1)(a). Contract claims accrue "on the date that the breach is discovered or should have been discovered by the exercise of reasonable diligence." C.R.S. 13-80-108(6). However, when PDX discovered or should have discovered the breach is inherently factual, and given the number of transactions and the uncertainty I face as to which sections of which contract were breached and whether they were subject to an exception or waiver, there is no way I can at this point determine whether particular alleged breaches that occurred before June 28, 2009 as a matter of law.

PDX suggests that the issue might be moot as to claims for payment pursuant to the "Second Exception," because they are governed by the six-year statute of limitations set forth at C.R.S. 13-80-103.5(a). If applicable, that would extend the accrual date back to June 28, 2006. However, that statute applies to "a liquidated debt or an unliquidated, determinable amount of money due." *Id.* In the hospital collection case cited by PDX, the debt was deemed "liquidated" because it could be "ascertained by adding pre-determined rates for the medial services provided." *Portercare Adventist Health System v. Lego,* 2386 P.3d 525, 526 (Colo. 2012). There might be simple, liquidated or easily calculable claims traceable to the Second Exception, but that has not been shown yet.

There are also equitable doctrines that sometimes justify tolling of the running of a limitations period. For example, Dish Network cites (but attempts to distinguish) the doctrine of equitable tolling which can be applied if "the defendant has wrongfully impeded the plaintiff's ability to bring the claim or truly extraordinary circumstances prevented the plaintiff from filing his or her claim despite diligent efforts." *Dean Witter Reynolds, Inc. v. Hartman,* 911 P.2d 1094, 1099 (Colo. 1996). Here Dish Network contends, not without reason, that a large part of the problem was PDX's own accounting and recordkeeping practices. PDX counters that Dish Network's rules and procedures were so complex that it struggled to understand and comply with them, and even as to the Exception process, Dish Network did not provide certain information that PDX needed to submit reconciliation claims. The latter argument might now be foreclosed by Magistrate Judge Shaffer's sanction recommendation. Regardless, these issues are inherently factual.

In short, the application of the statute of limitations, and even the determination of which statute applies to which claims, not to mention the possible application of equitable tolling, is too bound up in factual disputes to resolve now. That is not to say that the bar of the statute of limitations will not be applied once the facts are better organized and presented.

    2. <u>The Merits of the Claims</u>.

When the dust settles, this case seems to turn mostly on PDX's claim that, despite its failure to comply in many instances with the procedures in the Business Rules, Dish Network modified those requirements with the Exception process but then reneged on that undertaking. Whether this contention is based on express promises or bad faith

exercise of discretion retained by Dish Network in the Exception process or both has not been well clarified.

Sensing that this is where the case seemed to be heading, Dish Network has advanced several arguments in its Reply. [ECF No. 164]. I will address here those which I believe are the principle arguments. First, Dish Network raises what amounts to a pleadings issue, i.e., PDX has asserted claims of an oral modification of the ISA's for the first time in its Response to the Motion for Summary Judgment. I do not agree. There are numerous allegations in the Third Amended Complaint about the Exception process and various promises and representations that were made in connection with it. As is true of other allegations in the Third Amended Complaint, the precise nature of PDX's claims based on the Exception process is not articulated as precisely as it could have been. But the point of PDX's allegations regarding the Exception process is clear enough.

Dish also argues that its contracts can only be modified in writing, and therefore, any purported oral modifications are invalid. There are provisions in the ISA's, for example paragraph 20 of the 2006 ISA [ECF No. 128-9], to that effect. However, "a written contract may be modified by an oral agreement between the parties." *Cordillera Corp. v. Heard,* 592 P.2d 12, 14 (Colo. App.), *aff'd on other grounds,* 612 P.2d 92 (Colo. 1980). A provision that a contract may only be modified in writing "may itself be waived orally or by conduct of the parties." *Id.* Whether Dish Network's words or conduct modified its written contracts turns on fact issues that are disputed.

Dish Network again takes the position that it received no consideration for promises and representations made concerning the Exception process, and therefore, that

such promises or representations could not form a binding contract.  I am inclined to disagree that such promises and representations were entirely gratuitous on Dish Network's part.  PDX states that in exchange for these promises it continued to do work for and to provide benefit to Dish Network.  That is a material but disputed fact issue.

Finally, Dish Network argues that only officers at the Vice Presidential level were authorized to make exceptions to the written contracts, and that the promises and representations on which PDX is relying, if made at all, were made by lower level employees.  PDX has indicated that it was not privy to internal grants of authority within Dish Network, but that it was led to believe that Vice Presidential authority had been extended to the employees with whom PDX was dealing.[2]  If actual authority was not extended by a Vice President to the lower level employees, there still would be issues of apparent authority and ratification that would require resolution of issue of fact.

Whether the claims are based on express terms of an ISA or a Business Rule; or on the duty of good faith and fair dealing implied in the ISA's and Business Rules; or on specific promises and representations made in the Exception process that might create contractual or quasi-contractual liability; the case will not fly if PDX cannot specify exactly what its liability claims are.  But, having read the parties' briefs and exhibits, it is evident to me that these issues involve genuine issues of material fact that are not suitable for summary disposition.

### D. Conclusion.

Summary disposition of the contract claim is not appropriate.  I reiterate, however, that PDX has some work to do.  It cannot just throw out 3,541 transactions at

---

[2] PDX recorded various telephone conversations.  An example of a conversation during which the Dish Network employee confirmed that she had authority to act was provided in PDX's Response [ECF No. 150] at 15, ¶94.

trial and hope that the jury will figure out a way to award some damages.  Unless it can show that Dish Network breached specific contractual obligations, express or implied, and that such breaches caused the damages that it is seeking (or possibly an unjust enrichment or promissory estoppel claim if the was no applicable contractual obligation), PDX faces the prospect of a judgment in Dish Network's favor as a matter of law under Fed. R. Civ. P. 50(a).  Accordingly, the Court directs the parties to set another trial preparation conference before trial.  PDX should be prepared at that time to explain how it will be able to link each line item of claimed damage to specific breaches of duty.

### Order

Defendant's motion for summary judgment [ECF No. 124] is GRANTED IN PART AND DENIED IN PART.  It is granted as to the Third and Seventh Claims (the Fifth and Sixth Claims having previously been dismissed).  It is denied as to the First, Second and Fourth Claims.

DATED this 5th day of March, 2014.

BY THE COURT:

_____

R. Brooke Jackson
United States District Judge